The JOHNS HOPKINS UNIVERSITY, a Maryland corporation, Baxter Healthcare Corporation, a Delaware corporation, and Becton Dickinson and Company, a New Jersey corporation, Plaintiffs,

v.

CELLPRO, a Delaware corporation, Defendant.

Civ. A. No. 94–105–RRM.

United States District Court, D. Delaware.

Aug. 4, 1995.

As Revised Aug. 21, 1995.

William J. Marsden, Jr., Potter Anderson & Corroon, Wilmington, DE; Kenneth E. Madsen, and Steven J. Lee, Kenyon & Kenyon, New York City, for plaintiffs; Donald R. Ware, Foley, Hoag & Eliot, Boston, MA, for plaintiff Becton Dickinson and Co.; Michael Sennett, Bell, Boyd & Lloyd, Chicago, IL, for plaintiff Baxter Healthcare Corp.

Patricia S. Rogowski, Connolly, Bove, Lodge & Hutz, Wilmington, DE; Coe A. Bloomberg, Robert C. Weiss, Allan W. Jansen, and Jerrold B. Reilly, Lyon & Lyon, Los Angeles, CA, for defendant.

## OPINION

McKELVIE, District Judge.

This is a patent case. Johns Hopkins University and its co-plaintiffs Baxter Healthcare Corporation and Becton Dickinson and Company allege CellPro is willfully infringing U.S. Patent No. 4,965,204, which is owned by Johns Hopkins. CellPro denies liability and has counterclaimed for a declaratory judgment that the patent is invalid, not infringed and unenforceable. In its declaratory judgment action, CellPro also contends U.S. Patent Numbers 4,714,680, 5,035,994, and 5,130,-144 are not infringed, invalid and unenforcea-

ble. In their answer to the counterclaim, plaintiffs deny the additional patents are invalid and unenforceable and have alleged infringement of a number of claims of those patents. The parties are currently in the process of a two-week jury trial which began on July 24, 1995. This Opinion constitutes the court's findings as to the jury instructions, including issues of claim construction, and the verdict form.

### BACKGROUND

For the reasons set out by the court at the pre-trial conference, the court gave the following Preliminary Instructions to the jury in this case.

### PRELIMINARY JURY INSTRUCTIONS

Members of the jury:

Now that you have been sworn, I have the following preliminary instructions for your guidance on the nature of the case and your role as jurors.

*The Nature of the Action and the Parties*

This is a patent case. The dispute between the parties relates to bone marrow technology. Persons having severe diseases of the blood, such as leukemia, and persons whose bone marrow has been injured or destroyed (which may happen during chemotherapy) often benefit dramatically from having their bone marrow transplanted. This can be done by taking some of the patient's own bone marrow cells out of the body, and then putting them back in again (an "autologous" transplant), or by putting bone marrow cells from a donor into a patient (an "allogenic" transplant). During the trial, the parties will offer testimony to familiarize you with this technology. For your convenience, we have attached a glossary of some of the technical terms to which the parties may refer during the trial.

As I mentioned, this is a patent case. The United States Patent and Trademark Office has granted four patents to Dr. Curt Civin for inventions for various products and processes relating to this technology. Johns Hopkins University is the owner of the patents, which are identified by the Patent Office by number: No. 4,965,204 (which may be

called "the '204 patent"); No. 4,714,680 ("the '680 patent"); No. 5,035,994 ("the '994 patent"); and No. 5,130,144 ("the '144 patent"). These patents may also collectively be referred to as "the Civin patents." By a license agreement, Johns Hopkins has transferred certain rights under the Civin Patents to Becton Dickinson and Company. Thereafter, Becton Dickinson has licensed certain of those rights to Baxter Healthcare Corporation.

### The United States Patent

A United States patent confers on the owner the right to exclude others from making, using, or selling the patented invention within the United States, its territories, and its possessions for 17 years. During the trial, the parties will offer testimony to familiarize you with how one obtains a patent from the United States Patent and Trademark Office (sometimes referred to as "the PTO"), as well as with the contents of a patent, including the specification or written description and the claim or claims by which the applicant defines the subject matter of his or her invention. For your convenience, we have attached a glossary of some of the terms relating to patents to which the parties may refer during the trial.

### Patent Litigation

A person is said to be infringing on claims of a patent when they, without authority, make, use, or sell the patented invention, as described in the claims, within the United States before the 17 year term expires. A patent owner that believes someone is wrongfully infringing on his or her exclusive rights under a patent, may bring a lawsuit like this to stop the alleged infringing acts and recover damages. The owner has the burden to prove infringement of the claims of the patent and to prove damages caused by that infringement. A person sued for allegedly infringing a patent can deny infringement. They can also defend the case by proving the patent is invalid.

### The Parties' Contentions

In this case, Johns Hopkins, Becton Dickinson and Baxter Healthcare contend CellPro makes, uses and sells a hybridoma, a monoclonal antibody, and two related products that infringe claims of the '204 patent. They also contend that in selling the two products CellPro is inducing its customers to infringe the '994, '680 and '144 patents.

In response, CellPro denies it is infringing any claims of the Civin patents and contends the patents are invalid for failure to meet any one of three requirements in the patent laws. In particular, CellPro contends the patents are invalid for 1) lack of enablement; 2) anticipation; and 3) obviousness. At the end of the testimony, I will provide you with more detailed instructions on these issues. For your convenience, we have included brief descriptions of these defenses in the glossary of patent terms.

### Trial Procedure

We will start the trial in a few minutes. Counsel will present opening statements where they will identify for you the issues we will ask you to resolve and the evidence they expect to offer in support of their claims. Then each side will call witnesses and offer documents into evidence to provide you with information on the technology in issue and the facts relating to the dispute.

You should generally expect we will start the trial each morning at 9:00 a.m., take a break every 1 and ½ hours, break for lunch each day for one hour at 12:30, and end each day at 4:30. As the trial goes on we may need to make some adjustments to that schedule.

At the close of evidence (which we estimate should be around Wednesday of next week) I will provide you with written instructions on the law and with a verdict form that will identify the questions we will ask you to resolve. Counsel will then have an opportunity in closing arguments to review the evidence they have presented, their view of the significance of the facts, and their clients' views on how you should answer the questions in the verdict forms.

### Duty of Jury

It will be your duty to find what the facts are from the evidence as presented at the trial. You, and you alone, are the judges of the facts. You will have to apply those facts to the law and the patent claims as I instruct you at the close of the evidence.

You are the judges of the facts. I will decide which rules of law apply to this case, and I also decide about the meaning and scope of the patent claims. You must follow that law and claim interpretation whether you agree with it or not.

Nothing I say or do during the course of the trial is intended to indicate what your verdict should be.

*Evidence*

The evidence from which you will find the facts will consist of the testimony of witnesses and documents and other things admitted into evidence. In addition, the evidence may include certain facts as agreed to by the parties or as I instruct you.

Certain things are not evidence.

1. Statements, arguments, and questions by lawyers are not evidence.

2. Objections to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they believe testimony or exhibits being offered into evidence are not admissible under the rules of evidence. You should not be influenced by a lawyer's objection or by my ruling on the objection. If I sustain or uphold the objection, and find the matter is not admissible, you should ignore the question or document. If I overrule an objection and allow the matter in evidence, you should treat the testimony or document like any evidence. If I instruct you during the trial that some item of evidence is admitted for a limited purpose, you must follow that instruction and consider that evidence for that purpose only. If this does occur during the trial I will try to clarify this for you at that time.

3. Anything you see or hear outside the Courtroom is not evidence and must be disregarded. You are to decide this case solely on the evidence presented here in the Courtroom.

In judging the facts, it will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.

*Burden of Proof*

This is a civil case. The plaintiffs have the burden of proving infringement and damages by what is called a preponderance of the evidence. That means the plaintiffs have to produce evidence which, when considered in the light of all the facts, leads you to believe that what the plaintiffs claim is more likely true than not. To put it differently, if you were to put the plaintiffs' evidence and the defendant's evidence on the opposite sides of a scale, the evidence supporting the plaintiffs' claims would have to make the scales tip somewhat on their side. If the plaintiffs meet this burden, your verdict must be for plaintiffs. If not, your verdict must be for defendant.

In this case, defendant is urging that plaintiffs' patents are invalid. A patent is presumed to be valid. Accordingly, defendant has the burden of proving the patent invalid by clear and convincing evidence. Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. Proof by clear and convincing evidence is thus a higher burden then proof by a preponderance of the evidence.

Those of you who are familiar with criminal cases will have heard the term "proof beyond a reasonable doubt." That burden does not apply in a civil case; and you should, therefore, put it out of your mind in considering whether or not the plaintiffs have met their burden of proof by a preponderance of the evidence and whether defendant has met its burden of proof by clear and convincing evidence in this case.

*Conduct of the Jury*

Now, a few words about your conduct as jurors.

First, during the trial and until you have heard all of the evidence and retired to the jury room to deliberate, you are not to discuss the case with anyone, not even among yourselves. If anyone should try to talk to you about the case, bring it to my attention promptly.

Second, do not read or listen to anything touching on this case that is not admitted into evidence. By that I mean, do not read any newspaper articles, listen to any radio programs, or watch any television programs referring or relating to matters in this case.

Also, do not try to do any independent research or investigation on your own on matters relating to the case.

Finally, do not reach any conclusion until all of the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

If you wish, you may take notes. Ms. Brown, the Court Clerk, will arrange for pens, pencils and paper. If you do take notes, leave them in the jury room when you leave at night. And remember that they are for your own personal use. You are not to read or show them to anyone else.

### GLOSSARY OF PATENT TERMS

*Claims* Claims are the numbered paragraphs appearing at the end of the patent and describe the invention. The words of the claims delineate the patent owner's exclusive rights during the life of the patent.

*Specification* The specification is the information which appears in the patent and concludes with one or more claims. In the specification, the inventor sets forth a description of the invention, the preferred embodiment of the invention, and how to make and use it, so the public has available the information needed to utilize the invention.

*File wrapper* The written record of proceedings in the United States Patent and Trademark Office including the original patent application and subsequent communications between the Patent Office and applicant. The file wrapper may also be referred to as the "prosecution history" of the patent during the course of this trial.

*License* Permission to use the patented invention, which may be granted by a patent owner (or a prior licensee) in exchange for a fee called a "royalty."

*Patent Application* The initial papers filed in the United States Patent and Trademark Office (Patent Office or PTO) by an applicant. These typically include a specification, drawings and the oath (Declaration) of applicant.

*Patent Examiners* Personnel employed by the Patent and Trademark Office having expertise in various technical areas who review (examine) patent applications to determine whether the claims of a patent application are patentable and the disclosure adequately describes the invention.

*Prior art* Any information which is used to describe public, technical knowledge prior to the invention by applicant or more than a year prior to the filing date of his/her application.

*References* Any item of prior art (publication or patent) used to determine patentability.

*Defenses Alleged by CellPro in This Action:*

*Enablement* In the specification, the inventor must provide sufficient information to allow a person skilled in that technical field to make and use the invention without unreasonable experimentation.

*Anticipation* An invention must be new. A product or process described in the claim of a patent is not new where all of the elements of that product or process are present in a single piece of relevant prior art. Where this occurs, the piece of prior art is said to anticipate the invention as described by the words of the claims.

*Obviousness* In addition to being new, an invention must also be nonobvious when made. That is, the differences between the invention as described by the words of the claims and the prior art must not have been obvious to one of ordinary skill in the art at the time the invention was made.

### GLOSSARY OF TECHNICAL TERMS

*Antibody* Any of various proteins existing in the blood or developed by immunization that bind to cells, haptans, or foreign substances.

*Allogenic* Intraspecies variance at a particular gene locus. Referring to genetic variants within a species.

*Antigen* Any substance which is capable under appropriate conditions of eliciting

a specific immune response and of reacting with specific antibodies or specifically sensitized T-lymphocytes or both.

*Autologous* Part of the same individual. The term is used to describe self antigens or grafts taken from and returned to the same individual.

*Bone Marrow* The soft organic material that fills the cavities of bones and is the source of all blood cells in the body.

*Bone Marrow Transplantation* The process involving the removal and storage of bone marrow and its subsequent transplantation. Reintroduced bone marrow can be derived from the patient (autologous) or from a donor (allogenic).

*CD34* A cell-surface ("marker") antigen found on the surfaces of certain cells, including certain cells that are found in blood and bone marrow.

*CEPRATE LC34 Laboratory Cell Separation System* A product used in laboratory research and sold by CellPro. It is accused of infringement.

*CEPRATE SC Stem Cell Concentrator* A product used in bone marrow transplantation and sold by CellPro. It is accused of infringement.

*Engraftment* The implanting or transplanting of any tissue or organ into an existing organism.

*Epitope/Determinant* An epitope, sometimes called a "determinant," is a structure on an antigen which, under appropriate conditions, is capable of reacting with a specific antibody in such a way as to cause the antibody to become bonded to the antigen which has the epitope.

*GVHD* An abbreviation for Graft Versus Host Disease, a clinical syndrome in which transplanted foreign tissue reacts against the host.

*Hematopoiesis* The differentiation, growth, proliferation and maturation of all blood cell types from pluripotent stem cells (progenitor cells of all blood cells).

*Hematopoietic Stem Cells* Cells in the marrow that are specifically responsible for the proliferation and formation of blood cells.

*Hybridoma* A hybrid cell produced by the fusion of an antibody-producing lymphocyte with a tumor cell and used to culture continuously a specific antibody or a single molecular species.

*Monoclonal Antibodies* Chemically and immunologically homogeneous antibodies produced by hybridomas.

*My–10 Antibody* The My–10 antibody is a monoclonal antibody made by Dr. Civin and described in the Civin patents.

*Progenitor Cell* Parent or ancestor cell.

*12.8 Antibody* The 12.8 antibody is a monoclonal antibody made and sold by CellPro and accused of infringement.

During the course of the trial, the parties submitted various drafts and proposed versions of the final jury instructions. In view of the Federal Circuit's decision in *Markman v. Westview Instr., Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), the parties also presented argument, referring to testimony and other evidence offered during the course of this trial, on the proper interpretation of the disputed claims in this case. Consequently, on the eve of the last day of trial this court finalized the jury instructions and construed the disputed terms in the patents in suit.

## DISCUSSION

### I. Resolution of Claim Construction

Not having had the opportunity to review the claim construction issue prior to trial, the court endeavored to decide this issue after having heard the necessary evidence and argument. In so doing, the court is guided by the Federal Circuit's decision in *Markman* on claim construction.

In *Markman,* the Federal Circuit stated: "[I]n a case tried to a jury, the court has the power and the obligation to construe as a matter of law the meaning of language used in the patent claim." 52 F.3d at 979. As a rationale for that result, the court explained that competitors should be assured that a judge "trained in the law" will examine the patent and the prosecution history in a way to "arrive at the true and consistent scope of the patent owner's rights to be given legal effect," particularly in the light of the serious consequences attendant to a finding of infringement. *Id.* The court further indicated

that it has "long been and continues to be a fundamental principle of American law that the construction of a written evidence is exclusively for the court." *Id.* at 978. Thus, the court concluded that the meaning of disputed technical words in patent claims is "strictly a question of law for the court," stating a clear policy preference to have disputes over technical words in a patent claim resolved by judges. *Id.* at 977.

As the court in *Markman* declared, "[t]o ascertain the meaning of claims, we consider three sources: [t]he claims, the specification, and the prosecution history." *Id.* at 979. A trial judge may also consider expert testimony and other evidence outside the patent and its prosecution history, "to aid the court in coming to a correct conclusion as to the true meaning of the language employed." *Id.* at 980. "This evidence may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Id.*

■ In light of the *Markman* decision, this court adopts the following analysis for claim construction. This court will start with the assumption that words in a claim are used such that they should be read with their ordinary meaning. If there is a genuine dispute between the parties as to the meaning of a word or words in a claim, then this court will take one of two paths. First, this court will determine whether the word in dispute should be read with its ordinary meaning. If the word cannot be read by its ordinary meaning, then the court will determine whether the inventor intended to give the word a special meaning, and if he did, the court will explain to the jury that meaning using words that can be read with their ordinary meaning. If the inventor did not intend to give the word or words a special meaning, this court will determine what the words may mean to one skilled in the art and then express to the jury that meaning using words that can be read with their ordinary meaning.

In this case, the parties dispute the meaning of 6 portions of the claims of the patents in suit. For the reasons set out by the court during the August 1 and 2, 1995, conferences and as further supplemented below, the court resolves the disputes as follows.

■ The parties dispute the words "substantially free" as used in the '680, '994, and '144 patents. CellPro seeks to have this court instruct the jury that the words "substantially free" should be read to describe a maximum level or percentage. For example, claim 1 of the '680 patent reads: "A suspension of human cells comprising pluripotent lympho-hematopoietic stem cells substantially free of mature lymphoid and myeloid cells." CellPro suggests the words "substantially free" as used in this claim should be read to mean that "the suspension ha[s] no T-lymphocytes and the level of mature lymphoid and myeloid cells cannot exceed 10%."

The court finds the words "substantially free" can be understood using their common and ordinary meaning. The inventor chose to use the vague term "substantially," which regularly appears in patent claims. Furthermore, it is a term familiar to the common public. Therefore, the court will provide no additional instruction to the jury on the meaning of "substantially free."

The parties also dispute the meaning of the words "specifically binds" as used in the '204 and '994 patents. As indicated in the August 2, 1995, conference this court finds these words can also be read with their ordinary meaning. Therefore, the court will provide no additional instruction to the jury on "specifically binds."

The parties dispute the meaning of the words "stage specific" as used in claim 1 of the '204 patent. As indicated in the August 2 conference, this court finds these words cannot be read to have an ordinary meaning by the jury. The court looks to the specification and testimony by experts and Dr. Civin to find the words "stage specific" in claim 1 of the '204 patent should be read in context to have the following meaning conveyed in ordinary words for the jury: "wherein said antigen is stage specific, meaning: the antigen is on immature human marrow cells and not on mature human marrow cells."

The parties dispute the meaning of the words "an amount effective to effect such restoration." This court finds these words can be read with their ordinary meaning and will not provide further instruction to the jury.

The parties dispute the words "is specifically bound by the antibody produced by the hybridoma deposited under ATCC Accession No. HB–8383" as used in claim 1 of the '204 patent. Again, this court finds these words can be read with their ordinary meaning and will not provide further instruction to the jury.

Finally, the parties dispute the meaning of the word "administering" as used in the '144 patent. This court finds this word can be read with its ordinary meaning and will not provide further instruction to the jury.

II. *The Final Jury Instructions Given in This Case*

This district has published forms for proposed jury instructions for patent cases.

However, in an attempt to improve those instructions, the court redrafted some of them for this case. In redrafting the instructions, the court focused particularly on the use of plain language to describe principles of patent law. As a model the court used Herbert F. Schwartz, *Patent Law and Practice*, Federal Judicial Center (1988) and *Pattern Jury Instructions (Civil Cases)*, Prepared by the Committee on Pattern Jury Instructions, District Judges Association, Fifth Circuit.

Having set forth the court's construction of the words in the claims and for the reasons set out by the court at the various conferences during the trial on jury instructions and the verdict form, the court finally instructed the jury as follows.

## FINAL JURY INSTRUCTIONS

### TABLE OF CONTENTS

1. GENERAL INSTRUCTIONS
 1.1 INTRODUCTIONS
 1.2 JURORS' DUTIES
 1.3 BURDENS OF PROOF
 1.4 EVIDENCE DEFINED
 1.5 CONSIDERATION OF EVIDENCE
 1.6 DIRECT AND CIRCUMSTANTIAL EVIDENCE
 1.7 CREDIBILITY OF WITNESSES
 1.8 NUMBER OF WITNESSES
 1.9 OPINION TESTIMONY

2. THE PARTIES AND THEIR CONTENTIONS
 2.1 THE PARTIES
 2.2 PLAINTIFFS' CONTENTIONS
 2.3 DEFENDANT'S CONTENTIONS
 2.4 SUMMARY OF PATENT ISSUES

3. INFRINGEMENT
 3.1 CLAIM INFRINGEMENT
 3.2 DEPENDENT AND INDEPENDENT CLAIMS
 3.3 CLAIM CONSTRUCTION
 3.4 PATENT INFRINGEMENT—GENERALLY
 3.5 DIRECT INFRINGEMENT (LITERAL)
 3.6 INDUCING PATENT INFRINGEMENT
 3.7 CONTRIBUTORY INFRINGEMENT

4. VALIDITY DEFENSES
 4.1 AFFIRMATIVE DEFENSE OF INVALIDITY—GENERALLY
 4.2 ENABLEMENT
 4.3 OBVIOUSNESS
 4.3.1 SCOPE AND CONTENT OF THE PRIOR ART

5. DAMAGES

 5.1 COMPENSATORY DAMAGES IN GENERAL
 5.2 REASONABLE ROYALTY AS A MEASURE OF DAMAGES
 5.2.1 FACTORS FOR DETERMINING REASONABLE ROYALTY

6. DELIBERATION AND VERDICT

 6.1 INTRODUCTION
 6.2 UNANIMOUS VERDICT
 6.3 DUTY TO DELIBERATE
 6.4 COURT HAS NO OPINION

## 1. GENERAL INSTRUCTIONS

### 1.1 INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by explaining your duties and the general rules that apply in every civil case. I will then explain some rules that you must use in evaluating particular testimony and evidence.

Then I will explain the positions of the parties and the law you will apply in this case. Finally, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.

### 1.2 JURORS' DUTIES

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, by a preponderance of the evidence, the defendants are liable. It is my job to instruct you about the law, and also about what the claims of the patents mean; and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

### 1.3 BURDENS OF PROOF

This is a civil case in which the plaintiffs are charging the defendant CellPro with patent infringement. The plaintiffs have the burden of proving patent infringement by what is called a preponderance of the evidence. That means the plaintiffs have to produce evidence which, when considered in light of all of the facts, leads you to believe that what the plaintiffs claim is more likely true than not. To put it differently, if you were to put the plaintiffs' and the defendant CellPro's evidence on the opposite sides of a scale, the evidence supporting the plaintiffs' claims would have to make the scales tip somewhat on their side.

In this case, CellPro contends that certain claims of plaintiffs' patents are invalid. A patent, however, is presumed to be valid. Accordingly, CellPro has the burden of proving that the claims of the patents-in-suit are invalid by clear and convincing evidence. Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.

Those of you who are familiar with criminal cases will have heard the term "proof beyond a reasonable doubt." That burden does not apply in a civil case and you should, therefore, put it out of your mind in considering whether or not the plaintiffs or defendant have met their burden of proof.

## 1.4 EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and the facts that I have judicially noticed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I may have ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all of these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

## 1.5 CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## 1.6 DIRECT AND CIRCUMSTANTIAL EVIDENCE

Now, some of you may have heard the terms "direct evidence" and "circumstantial evidence." Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

## 1.7 CREDIBILITY OF WITNESSES

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he gave at the trial.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

## 1.8 NUMBER OF WITNESSES

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the wit-

nesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

### 1.9 OPINION TESTIMONY

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—he is called an expert witness—is permitted to state his opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

### 2. *THE PARTIES AND THEIR CONTENTIONS*

### 2.1 THE PARTIES

The plaintiffs are Johns Hopkins University ("Hopkins"), Becton Dickinson and Company ("Becton"), and Baxter Healthcare Corporation ("Baxter"). Hopkins owns United States Patent No. 4,965,204 patent ("the '204 patent"); United States Patent No. 4,714,680 ("the '680 patent"); United States Patent No. 5,035,994 ("the '994 patent"); and United States Patent No. 5,130,144 ("the '144 patent"). The inventor of all of these patents is Dr. Curt Civin, who is a physician at Johns Hopkins University. These patents therefore may be referred to collectively as the "Civin Patents." Plaintiff Becton Dickinson and Company has licensed the Civin Patents from Johns Hopkins University, and Becton Dickinson and Company has licensed certain therapeutic applications of those patents to Baxter Healthcare Corporation.

The defendant is CellPro, Inc.

### 2.2 PLAINTIFFS' CONTENTIONS

Plaintiffs contend CellPro makes, uses, or sells a monoclonal antibody called "12.8," through the use of a hybridoma called the "12.8 hybridoma," and that the 12.8 antibody is incorporated into two CellPro products, the CEPRATE LC34 Laboratory Cell Separation System and the CEPRATE SC Stem Cell Concentrator. Plaintiffs further contend that the 12.8 antibody and 12.8 hybridoma infringe claims of the '204 patent, that CellPro's making, using or selling of these two products that contain the 12.8 antibody infringes claims 1 and 4 of the '204 patent, and that CellPro induces others to infringe claims 1–5 of the '680 patent, claims 1–4 of the '994 patent and claims 1–4 of the '144 patent.

### 2.3 DEFENDANT'S CONTENTIONS

Defendant CellPro denies it infringes any of the Civin patents and contends the claims of the Civin patents are invalid. Specifically, CellPro contends:

1. Plaintiffs have failed to meet their burden of proof that the making, using or selling by CellPro of any CellPro product or process infringes any claim of the Civin patents.

2. That with the exception of claims 3 and 6 of the '204 patent, all of the claims of the Civin patents are invalid because they fail to teach and enable others working in the art how to practice the invention, as broadly as it is claimed, without undue experimentation.

3. That each and every one of the claims of the '204, '680, '994 and '144 patents is invalid because the subject matter of its claimed invention was obvious to those in the field.

### 2.4 SUMMARY OF PATENT ISSUES

In this case, you must decide several things according to the instruction that I shall give you. They include:

1. Which, if any, of the claims of the Civin patents have plaintiffs proven by a preponderance of the evidence CellPro has literally infringed.

2. Which, if any, of the claims of the Civin patents has CellPro proven by clear and convincing evidence are invalid.

3. If you find at least one claim of the '204 patent infringed and not invalid, what amount of damages, if any, have plaintiffs proven by a preponderance of the evidence.

### 3. *INFRINGEMENT*

### 3.1 CLAIM INFRINGEMENT

■ The patent claims are the numbered paragraphs at the end of the patent. In the claims, the inventor uses words to define the boundaries of his or her invention. Only the claims of the patent can be infringed. Neither the specification, which is the written description of the invention, nor the drawings

of a patent can be infringed. Each of the claims must be considered individually, and to show patent infringement, plaintiffs need only establish that one claim has been infringed.

## 3.2 DEPENDENT AND INDEPENDENT CLAIMS

■ There are two different types of claims in a patent. The first type is called an independent claim. An independent claim does not refer to any other claim of the patent. An independent claim is read separately to determine the scope of the claim.

■ On the other hand, a dependent claim refers to at least one other claim in the patent and thus incorporates all of the limitations or words of that other claim to which the dependent claim refers. Accordingly, to determine what a dependent claim covers, both the dependent claim and the claim or claims to which it refers must be read.

For example, Claim 1 of the '204 patent is an independent claim. Claim 2 of the '204 patent is a dependent claim which depends from claim 1. For a product to infringe claim 2, the words of claim 1 in addition to the words of claim 2 must describe that product.

■ Where an independent claim fails to describe an accused product, claims which depend from that claim cannot describe an accused product. That is, if you find the words used in claim 1 do not describe the accused product then you cannot find infringement of claim 2 because there would be no way the words in claim 1 and 2 could describe that product.

## 3.3 CLAIM CONSTRUCTION

The Claims at issue in this case are as follows.

*United States Patent 4,965,204*

1. A monoclonal antibody which specifically binds to an antigen on non-malignant, immature human marrow cells, wherein said antigen is stage specific and not lineage dependent, and said antigen is also specifically bound by the antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483.

I have determined the words "wherein said antigen is stage specific" in this claim should be read as follows:

"wherein said antigen is stage specific, meaning: the antigen is on immature human marrow cells and not on mature human marrow cells."

2. The monoclonal antibody of claim 1 that specifically binds a binding site on said antigen which overlaps the binding site on said antigen specifically bound by the monoclonal antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483.

3. The monoclonal antibody of claim 1 that is the antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483.

4. A hybridoma which produces a monoclonal antibody of claim 1.

5. A hybridoma which produces a monoclonal antibody of claim 2.

6. The hybridoma deposited under ATCC Accession No. HB–8483.

*United States Patent 4,965,680*

1. A suspension of human cells comprising pluripotent lymphohematopoietic stem cells substantially free of mature lymphoid and myeloid cells.

2. The cell suspension of claim 1 further comprising colony-forming cells for granulocytes/monocytes (CC–GM), colony-forming cells for erythrocytes (BFU–E), colony-forming cells for eosinophils (CFC–Eo), multipotent colony-forming cells (CFC–GEMM), and immature lymphoid precursor cells.

3. The cell suspension of claim 1 substantially free of cells without a cell-surface antigen recognized by the monoclonal antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483.

4. A suspension of human cells from blood comprising pluripotent lymphohematopoietic stem cells substantially free of mature lymphoid and myeloid cells.

5. A suspension of human cells from marrow or blood comprising cells having a cell-surface antigen recognized by the antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483 and substantially free of cells that do not have a cell-surface antigen recognized by said antibody, said suspension having the ability to restore the production of lymphoid and hematopoietic cells to a human lacking said production.

*United States Patent 5,035,994*

1. A method of isolating a population of human cells containing pluripotent lympho-hematopoietic stem cells comprising:

(a) providing a cell suspension from human tissue, said tissue selected from the group consisting of marrow and blood;

(b) contacting said cell suspension with a monoclonal antibody to immature human marrow cells that is stage-specific and not lineage dependent so that said antibody binds to said stem cells, wherein said antibody specifically binds an antigen on human pluripotent lympho-hematopoietic stem cells said stem cells expressing an antigen that is specifically bound by the monoclonal antibody produced by the hybridomas deposited under ATCC Accession No. HB–8483 and does not specifically bind an antigen on mature, human myeloid and lymphoid cells; and

(c) separating and recovering from said cell suspension the cells bound by said antibody, said bound cells being substantially free of mature lymphoid and myeloid cells.

2. The method of claim 1 wherein said antibody specifically binds a cell-surface protein on a human leukemic cell line selected from the group consisting of the KG–1 and KG–1a cell lines, said protein having an apparent molecular weight of approximately 115 kD as determined by SDS–PAGE analysis.

3. The method of claim 1 wherein said antibody specifically binds an antigen also specifically bound by the monoclonal antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483.

4. The method of claim 1 wherein said antibody corresponds to the monoclonal antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483 as demonstrated by binding inhibition assay.

5. The method of claim 1 wherein said antibody is produced by the hybridoma deposited under ATCC Accession No. HB–8483.

6. A method of isolating a population of human cells containing pluripotent lympho-hematopoietic stem cells comprising:

(a) providing a cell suspension from human tissue, said tissue selected from the group consisting of marrow and blood;

(b) contacting said cell suspension with a solid-phase linked monoclonal antibody to immature human marrow cells that is stage-specific and not lineage-dependent so that said antibody binds to said stem cells, wherein said antibody specifically binds an antigen on human pluripotent lympho-hematopoietic stem cells, said stem cells expressing an antigen that is specifically bound by the monoclonal antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483 but does not specifically bind an antigen on mature human myeloid and lymphoid cells;

(c) separating unbound cells from said solid-state linked monoclonal antibody; and

(d) recovering bound cells from said solid-phase linked monoclonal antibody after separating said unbound cells, said bound cells being substantially free of mature lymphoid and myeloid cells.

7. The method of claim 6 wherein said cell suspension is human blood.

8. The method of claim 7 wherein step (b) comprises continuously withdrawing blood from the circuitry system of a donor, passing said blood through a column containing said solid-phase linked monoclonal antibody, and then returning said blood to the circulatory system of said donor.

9. The method of claim 6 wherein said antibody specifically binds a cell-surface protein on a human leukemic cell line selected from the group consisting of the KG–1 and KG–1a cell lines, said antigen

having an apparent molecular weight of approximately 115 kD as determined by SDS–PAGE analysis.

10. The method of claim 6 wherein said antibody specifically binds an antigen also specifically bound by the monoclonal antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483.

11. The method of claim 8 wherein said antibody specifically binds an antigen also specifically bound by the monoclonal antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483.

12. The method of claim 8 wherein said antibody is produced by the hybridoma deposited under ATCC Accession No. HB–8483.

*United States Patent 5,130,144*

1. A method of transplanting stem cells comprising:

(a) providing a suspension of human cells comprising pluripotent lympho-hematopoietic stem cells substantially free of mature lymphoid and myeloid cells, having the ability to restore the production of lymphoid and hematopoietic cells in a patient where such production is lacking; and

(b) administering said cell suspension to a human patient in an amount effective to effect such restoration.

2. The method of transplanting stem cells, as recited in claim 1, wherein, said cell suspension comprises colony-forming cells for granulocytes/-monocytes (CFC–GM), colony-forming cells for erythrocytes (BFU–E), colony forming cells for eosinophils (CFC–Eo), multipotent colony-forming cells (CFC–GEMM), and immature lymphoid precursor cells.

3. A method of transplanting stem cells, comprising:

(a) providing a suspension of human stem cells comprising pluripotent lympho-hematopoietic stem cells substantially free of mature lymphoid and myeloid cells, said suspension having the ability to restore the production of lymphoid and hematopoietic cells to a human lacking said production; and

(b) administering said cell suspension to a human patient in an effective amount; wherein said suspension of human cells is substantially free of cells without a cell-surface antigen recognized by the monoclonal antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483.

4. A method of transplanting stem cells, comprising:

(a) providing a suspension of human cells from marrow or blood comprising cells having a cell-surface antigen recognized by the antibody produced by the hybridoma deposited under ATCC Accession No. HB–8483 and substantially free of cells that do not have a cell-surface antigen recognized by said antibody, said suspension having the ability to restore the production of lymphoid and hematopoietic cells to a human lacking said production;

(b) administering said cell suspension to a human patient in an effective amount.

## 3.4 PATENT INFRINGEMENT— GENERALLY

■ A patent confers on its owner the right to exclude others from making, using or selling the patented invention in the United States during the term of the patent. One who makes, uses or sells a product described by a claim in a patent is said to infringe that patent. This type of infringement is called direct infringement.

■ Direct infringers, however, are not the only ones who may be held liable for patent infringement. A person who aids and abets a direct infringer may also be held liable for infringement. A person may aid or abet a direct infringer either by contributing to that direct infringement or by actively inducing infringement of a patent.

■ Thus, there are three ways to infringe a patent. One may: (1) directly infringe a patent; (2) induce others to infringe a patent, in which case the inducer is liable for infringement as well as the direct infringer; or (3) contribute to the infringement of a patent by another by supplying a component specially designed for the patented invention, in which case both the direct infringer and

the contributory infringer would be liable for patent infringement.

### 3.5 DIRECT INFRINGEMENT (LITERAL)

■ As previously mentioned, a person is liable for direct literal infringement of a patent where that person makes, uses, or sells a product or process described by the words in a patent claim in the United States during the term of the patent and without the authority of the patent owner. Intent to infringe is not required to establish infringement.

Thus, plaintiffs must prove by a preponderance of the evidence each of the following:

1. That CellPro did not have the authority from the plaintiffs to make, use, sell the accused product or process under the Civin patents;

2. That CellPro has made, used, or sold the accused product or process;

3. That the claims asserted describe the accused product or process, made, used, or sold by CellPro;

4. That CellPro has made, used, or sold the accused product or process within the United States, its Territories, or its Possessions;

5. That CellPro has made, used, or sold the accused product or process during the term of the patent.

You must consider these elements for each claim asserted by plaintiffs and for each product accused of infringement. Remember, the question is whether defendant's product or process infringes any claim of plaintiffs' patent, and not whether defendant's product or process is similar or not to a product made or a process used by plaintiffs. Accordingly, you must be certain to compare defendant's accused product or process with the claim it is alleged to infringe and not with any product made or process used by plaintiffs or with a preferred embodiment presented in the patent disclosure.

### 3.6 INDUCING PATENT INFRINGEMENT

A holder of a patent which describes a process or method in its claims often must rely on indirect infringement to protect his or her rights. That is, without liability for indirect infringement, a company could manufacture a machine to perform a process described in a patent claim and sell those machines without fear of recourse by the patent holder. This situation would be particularly troublesome where those who purchased the machine and used the process described in the claim could not themselves be sued. One form of indirect infringement is inducement to infringe.

■ Inducement to infringe requires active steps knowingly taken—knowingly at least in the sense of purposeful, intentional, as distinguished from accidental and inadvertent. Expressed differently, to sustain a claim of inducement, the patent holder must establish that the defendant purposefully caused, urged or encouraged another individual to infringe a claim of the plaintiff's patent with knowledge of the likely infringing result.

Thus, plaintiffs must prove by a preponderance of the evidence each of the following:

1. That CellPro actively induced another to infringe plaintiffs' patents by providing, for example, labels, advertising or other sales methods, instructions and directions to perform the process or methods described in the claim;

2. That the actions of the party said to have been induced to infringe constitute direct infringement.

■ As to the first element, plaintiffs must show that CellPro possessed the requisite state of mind or specific intent to encourage another's infringement and not merely that defendant had knowledge of the acts alleged to constitute inducement. A supplier is not liable for inducing infringement if it merely makes the article available, even though the supplier knows that some purchasers will use it to infringe.

■ The defendant cannot be liable for inducing infringement unless a patent claim is directly infringed in the United States. Proof of inducing infringement and the underlying direct infringement by persons allegedly induced to infringe may be based on circumstantial evidence you have heard in

this case, rather than direct evidence of infringement.

## 3.7 CONTRIBUTORY INFRINGEMENT

■ A second form of indirect infringement is contributory infringement. Contributory infringement of a claim that describes a process is established where one offers for sale a device which may be and ordinarily is used, and is sold with intention of being used in the manner described in the claim. That is, the patent holder must establish that a device was sold and used in carrying out a process described in a claim of the patent and that the seller knew the product was especially made for that purpose and not a staple article suitable for a substantial noninfringing use.

Thus, plaintiffs must prove by a preponderance of the evidence each of the following to establish contributory infringement:

1. That CellPro sold or supplied a product;

2. That the product sold or supplied by CellPro is not a staple article of commerce capable of substantial noninfringing use;

3. That CellPro sold or supplied the product with knowledge that the product was especially made for use in the manner described in the claim;

4. That the product is actually used in a manner that directly infringes the claim.

■ In determining whether the product supplied by CellPro is a "staple article of commerce," you should focus on the product actually supplied by CellPro, not on one ingredient in that product, and you should take into account the quality, quantity and efficiency of the suggested uses. That a product is known to have potential infringing uses is not sufficient to establish contributory infringement.

The defendant cannot be liable for contributory infringement unless a patent claim is directly infringed.

## 4. VALIDITY DEFENSES

### 4.1 AFFIRMATIVE DEFENSE OF INVALIDITY—GENERALLY

The defendant CellPro contends the claims of the Civin patents are invalid under one or more of the following grounds:

(1) *Non-enablement:* That with the exception of claims 3 and 6 of the '204 patent, each claim of the Civin patents is invalid because, as of February 6, 1984, the Civin patents did not disclose or teach others how to make or practice the invention, as broadly as it is claimed by that claim, without undue experimentation.

(2) *Obviousness:* That each and every claim of the Civin patents is invalid because the invention claimed by it was obvious.

### 4.2 ENABLEMENT

■ The Patent Laws require the specification of a patent be sufficiently detailed to allow one of ordinary skill in the art to make or carry out the invention at the time the application for the patent was filed without undue or unreasonable experimentation. In this case, the application for the Civin patents was filed on February 6, 1984. A specification that requires some experimentation to make or carry out the invention can be enabling. A specification, however, is not enabling if it requires a level of experimentation that is unreasonable under the circumstances. Whether undue experimentation is required is judged by evaluating the following factors:

1. the quantity of experimentation in terms of time and effort necessary to make and practice each invention;

2. the amount of direction or guidance presented in the specification;

3. the presence or absence of working examples;

4. the nature of the invention;

5. the state of the prior art as of the filing date;

6. the relative skill of those in the art;

7. the predictability or unpredictability of the factors which the invention involves; and

8. the breadth of the claims at issue.

Thus, CellPro must prove by clear and convincing evidence that one skilled in the art would not be able to make or carry out the invention as described by all of the claims

of the Civin patents, except claims 3 and 6 of the '204 patent, as of February 6, 1984, without undue experimentation.

### 4.3 OBVIOUSNESS

 In addition to being invalid for describing something old, a claim may be invalid because it describes something that would have been obvious to one of ordinary skill in the art at the time it was made. A claim is said to be obvious if the differences between the subject matter of the claim and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to one of ordinary skill in the art. In order to evaluate a claim of obviousness, you must first examine the following:

1. the scope and content of the prior art relied upon by the party alleging invalidity of the patent in suit;

2. the differences, if any, between each claim of the patent in suit and the prior art;

3. the level of ordinary skill in the pertinent art as of February 6, 1984; and

4. objective evidence related to the features of the invention, such as commercial success, long-felt but unsolved need, failure of others to solve the problem, whether the same or similar inventions were made independently by others prior to or at about the same time as the invention of the patents in suit, and acquiescence in the patent by others.

Thus, CellPro must prove by clear and convincing evidence that the differences between the subject matter described in the claim and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to one of ordinary skill in the relevant art.

CellPro contends that the following two publications render all of the claims of all of the Civin patents invalid for obviousness.

1. Defendant's Exhibit 15, which is the abstract which Dr. Civin published in the journal *Blood* in 1982 (Vol. 60, No. 5, Supplement 1, Item No. 307, at page 95a).

2. Defendant's Exhibit 1033, which is an article entitled "An Undifferentiated Variant Derived from the Human Acute Myelogenous Leukemia Cell Line (KG–1)," published in the journal *Blood* in August 1980 (Vol. 56, No. 2, at pages 265–73).

Additionally, as to the '144 patent, CellPro contends that those two publications along with the following publication render the claims in the '144 patent invalid for obviousness.

1. Defendant's Exhibit 1040, which is a 1971 article entitled "Bone Marrow Transplants at the Ontario Cancer Institute" and authored by Amato and others. It can be found in *Transplantation Today: Proceedings of the Third International Congress of the Transplantation Society* at pages 397–99.

### 4.3.1 SCOPE AND CONTENT OF THE PRIOR ART

 As I just instructed you, in arriving at your decision on the issue of whether or not the claimed invention is obvious to one of ordinary skill in the art, you must first determine the scope and content of the prior art. This means that you must determine what prior art is reasonably pertinent to the particular problem with which the inventor was faced. Scope and content of prior art includes references from those areas a person with ordinary skill in the art would look to in solving a particular problem. The prior art includes the following:

1. Prior publications having a publication date before February 6, 1983;

2. Anything in public use or on sale in the United States before February 6, 1983;

3. Anything that was publicly known or used by others in this country before the date of invention of the patents in suit; and

4. Anything that was made or built or any process that was used in this country by another person before the dates of invention of the patents in suit, where the thing made or built or the process used was not abandoned, suppressed or concealed.

### 5. *DAMAGES*

### 5.1 COMPENSATORY DAMAGES IN GENERAL

Plaintiffs contend they are entitled to damages for defendant's infringement of the '204 patent only. If you decide CellPro has failed

to persuade you that the '204 patent is invalid and plaintiffs have persuaded you that CellPro has infringed one or more claims of the '204 patent, you must then turn to the issue of damages.

Plaintiffs contend they are entitled to damages equal to a reasonable royalty.

## 5.2 REASONABLE ROYALTY AS A MEASURE OF DAMAGES

■ A reasonable royalty is the amount of money that would be agreed to in a hypothetical arms length negotiation between the owners of the patent rights and the infringer, with both operating under the assumption that the negotiated patent is not invalid and is infringed, i.e., that absent the "reasonable royalty" payment, that the infringer would respect the patent.

In determining a reasonable royalty, you should return to late 1990.

### 5.2.1 FACTORS FOR DETERMINING REASONABLE ROYALTY

In determining such a reasonable royalty, some of the factors that should be considered are:

1. the royalties received by the patentee for the licensing of others under the '204 patent and the rates paid by the licensee for the use of other patents comparable to the '204 patent;

2. the nature and scope of the license, as exclusive or non-exclusive; or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold;

3. the licensor's established policy and marketing program to maintain his patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

4. the commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventors or promoters;

5. the effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator or sales of

his non-patented items, and the extent of such derivative or convoyed sales;

6. the duration of the patent and the term of the licenses;

7. the established profitability of the product made under the patent, its commercial success, and its current popularity;

8. the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;

9. the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

10. the extent to which the infringer has made use of the invention, and any evidence probative of the value of that use;

11. the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

12. the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

13. the opinion testimony of qualified experts; and

14. any other economic factor that a normally prudent businessman would, under similar circumstances, take into consideration in negotiating the hypothetical license.

## 6. DELIBERATION AND VERDICT

### 6.1 INTRODUCTION

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must

write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take me some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this court is juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4–3, or 6–1, or whatever your vote happens to be. That should stay secret until you are finished.

### 6.2 UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. You will then return to the courtroom and your foreperson will give your verdict.

It is proper to add the caution that nothing said in these instructions and nothing in the form of verdict is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

### 6.3 DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that—your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

### 6.4 COURT HAS NO OPINION

Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.

III. *Instruction Not Given*

On the last day of trial, CellPro withdrew its claim for anticipation. However, were the claim to go to the jury the court would have given the following instruction.

### 4.2 ANTICIPATION

■ A patent claim is invalid because it describes something old. Where a printed publication describes the invention set forth in the patent claim in sufficient detail to enable one of ordinary skill in the art to

which the invention pertains to make the invention, before the date of invention or more than one year prior to the filing date of the patent that patent claim is invalid for anticipation.

Thus, CellPro must prove by clear and convincing evidence each of the following:

1. That a single prior art reference describes or depicts that which is described by the claim or that the reference contains enough information to enable one skilled in the art to make the invention described in the claim;

2. That the reference was accessible to the public before Civin's date of invention or more than one year prior to the filing date of his patents.

The essence of a printed publication is accessibility to the public. It must be reasonably accessible to at least some segment of the public.

■ So long as the required accessibility or dissemination is shown, the manner in which the information is recorded is unimportant. It is only required that the information be maintained in some permanent form, such as magnetic tape, microfilm, photographs, photocopies, etc.

■ It is not necessary that the printed publication be available to every member of the public. It must be available, without restriction, to that segment of the public most likely to avail itself of the publication's contents.

■ For a publication to constitute an anticipation of an invention, it must be capable, when taken in conjunction with the knowledge of people of ordinary skill in the art, of placing the invention in the possession of the reader. The disclosure must be enabling and meaningful. In determining whether the disclosure is complete, enabling and meaningful, you should take into account what would have been within the knowledge of a person of ordinary skill in the art at the time, and you may consider other publications which shed light on the knowledge such a person would have had. However, to be enabling prior art, the printed publication

need only enable (i.e., teach how to make) only one species covered by a broad claim.

IV. *The Verdict Form*

■ During the course of the trial, counsel for both parties requested that the court include blank spaces on the verdict form to elicit from the jury the prior art they may have relied upon to find claims of the patents in suit obvious or anticipated. In advocating this use of interrogatories accompanying a general verdict on these issues, the parties suggested to the court that the Federal Circuit requires such factual questions.

Federal Rule of Civil Procedure 49(b) states: "The court *may* submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict." (emphasis added). Under Rule 49, the decision whether to use a general verdict accompanied by special interrogatories and the form of those interrogatories is typically a matter left to the discretion of the trial court. *See Simmons v. City of Philadelphia,* 947 F.2d 1042, 1056 (3d Cir. 1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992); *see also Flanigan v. Burlington Northern Inc.,* 632 F.2d 880, 884 (8th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981); *see generally* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2511, at 218 (1995).

While generally preferring to receive a general verdict, this court will submit special interrogatories to the jury to elicit specific findings of fact where appropriate. In this case, the court found its preference for a general verdict outweighed any need to submit interrogatories to the jury in the light of the facts and circumstances of this case.

Consequently, the court submitted the following verdict form to the jury.

### VERDICT

We, the jury, unanimously find as follows:

I. *INFRINGEMENT*

1. Do you find that plaintiffs have shown by a preponderance of the evidence that de-

fendant CellPro's making, use, or sale of the 12.8 *antibody* literally infringes any of the following claims of *the '204 patent?* (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 1 YES_____ NO_____
Claim 2 YES_____ NO_____

2. Do you find that plaintiffs have shown by a preponderance of the evidence that defendant CellPro's making, use, or sale of the 12.8 *hybridoma* literally infringes any of the following claims of *the '204 patent?* (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 4 YES_____ NO_____
Claim 5 YES_____ NO_____

3. Do you find that plaintiffs have shown by a preponderance of the evidence that the suspension of human stem cells which may be produced by use of defendant CellPro's "CEPRATE LC" or "CEPRATE SC" devices literally infringes any of the following claims of *the '680 patent?* (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 1 YES_____ NO_____
Claim 2 YES_____ NO_____
Claim 3 YES_____ NO_____
Claim 4 YES_____ NO_____
Claim 5 YES_____ NO_____

4. Do you find that plaintiffs have shown by a preponderance of the evidence that defendant CellPro's making, use, or sale of its "CEPRATE LC" or "CEPRATE SC" devices has induced infringement of any of the following claims of *the '680 patent?* (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 1 YES_____ NO_____
Claim 2 YES_____ NO_____
Claim 3 YES_____ NO_____
Claim 4 YES_____ NO_____
Claim 5 YES_____ NO_____

5. Do you find that plaintiffs have shown by a preponderance of the evidence that defendant CellPro's making, use, or sale of its

"CEPRATE LC" or "CEPRATE SC" devices has contributed to the infringement of any of the following claims of *the '680 patent?* (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____
Claim 5 YES _____ NO _____

6. Do you find that plaintiffs have shown by a preponderance of the evidence that the methods used or recommended by defendant CellPro in connection with its "CEPRATE LC" or "CEPRATE SC" devices literally infringe any of the following claims of *the '994 patent?* (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____

7. Do you find that plaintiffs have shown by a preponderance of the evidence that defendant CellPro's making, use, or sale of its "CEPRATE LC" or "CEPRATE SC" devices has induced infringement of any of the following claims of *the '994 patent?* (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____

8. Do you find that plaintiffs have shown by a preponderance of the evidence that defendant CellPro's making, use, or sale of its "CEPRATE LC" or "CEPRATE SC" devices has contributed to the infringement of any of the following claims of *the '994 patent?* (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____

9. Do you find that plaintiffs have shown by a preponderance of the evidence that the methods used or recommended by defendant CellPro in connection with its "CEPRATE LC" or "CEPRATE SC" devices literally infringe any of the following claims of *the '144 patent*? (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for Cell-Pro.)

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____

10. Do you find that plaintiffs have shown by a preponderance of the evidence that defendant CellPro's making, use, or sale of its "CEPRATE LC" or "CEPRATE SC" devices has induced infringement of any of the following claims of *the '144 patent*? (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____

11. Do you find that plaintiffs have shown by a preponderance of the evidence that defendant CellPro's making, use, or sale of its "CEPRATE LC" or "CEPRATE SC" devices has contributed to the infringement of any of the following claims of *the '144 patent*? (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____

## II. *VALIDITY*

12. Do you find that defendant has shown by clear and convincing evidence that any of the following claims of the patents in suit is invalid due to obviousness? (A "YES" answer is a finding for CellPro. A "NO" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson.)

### The '204 Patent

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____
Claim 5 YES _____ NO _____
Claim 6 YES _____ NO _____

### The '680 Patent

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____
Claim 5 YES _____ NO _____

### The '994 Patent

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____
Claim 5 YES _____ NO _____
Claim 6 YES _____ NO _____
Claim 7 YES _____ NO _____
Claim 8 YES _____ NO _____
Claim 9 YES _____ NO _____
Claim 10 YES _____ NO _____
Claim 11 YES _____ NO _____
Claim 12 YES _____ NO _____

### The '144 Patent

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____

13. Do you find that defendant has shown by clear and convincing evidence that any of the following claims of the patents in suit is invalid due to lack of enablement? (A "YES" answer is a finding for CellPro. A "NO" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson.)

### The '204 Patent

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 4 YES _____ NO _____
Claim 5 YES _____ NO _____

### The '680 Patent

Claim 1 YES _____ NO _____
Claim 2 YES _____ NO _____
Claim 3 YES _____ NO _____
Claim 4 YES _____ NO _____
Claim 5 YES _____ NO _____

**The '994 Patent**

| | | | | |
|---|---|---|---|---|
| Claim 1 | YES | _____ | NO | _____ |
| Claim 2 | YES | _____ | NO | _____ |
| Claim 3 | YES | _____ | NO | _____ |
| Claim 4 | YES | _____ | NO | _____ |
| Claim 5 | YES | _____ | NO | _____ |
| Claim 6 | YES | _____ | NO | _____ |
| Claim 7 | YES | _____ | NO | _____ |
| Claim 8 | YES | _____ | NO | _____ |
| Claim 9 | YES | _____ | NO | _____ |
| Claim 10 | YES | _____ | NO | _____ |
| Claim 11 | YES | _____ | NO | _____ |
| Claim 12 | YES | _____ | NO | _____ |

**The '144 Patent**

| | | | | |
|---|---|---|---|---|
| Claim 1 | YES | _____ | NO | _____ |
| Claim 2 | YES | _____ | NO | _____ |
| Claim 3 | YES | _____ | NO | _____ |
| Claim 4 | YES | _____ | NO | _____ |

## III. *DAMAGES*

14. If you found at least one claim of the '204 patent infringed and not invalid, what amount of damages in the form of a reasonable royalty do you find plaintiffs have proven by a preponderance of the evidence?

AMOUNT _____

## V. *The Willfulness Instruction and Special Verdict*

Finally, the court sequenced the willfulness issue until after a verdict on liability and damages. Should it be necessary, the court will give the following instruction on willful infringement.

### 1. WILLFUL INFRINGEMENT

■ Certain remedies may be available to a patent owner where infringement of a claim of a patent is found to be willful. Infringement becomes willful when, upon consideration of all of the facts and circumstances, clear and convincing evidence establishes that the infringer acted in disregard of the patent, that the infringer had no reasonable basis for believing it had a right to engage in the infringing acts.

■ Thus, the plaintiffs must prove by clear and convincing evidence each of the following:

1. That the infringer was aware of the patent;

2. That the infringer had no reasonable basis for believing it had a right to engage in the infringing acts either because it had formed a good faith belief that the claim of the patent at issue was invalid or not infringed or both.

This second element focuses on the infringer's state of mind. Factors which may be helpful in evaluating the infringer's state of mind include the following:

a. That the infringer copied the ideas or designs of the patent holder;

b. That the infringer had actual notice of the patent;

c. Whether the infringer sought, obtained, and justifiably relied on legal advice from counsel on whether the patents were invalid or not infringed.

### 2. RELIANCE ON THE ADVICE OF COUNSEL

■ Reliance on the advice of counsel constitutes a defense to a charge of willful infringement. A party can not be said to have willfully infringed a patent where it acts in good faith on the competent advice of counsel that the patent is invalid, unenforceable, or not infringed.

In evaluating the defense of reliance on the advice of counsel you should evaluate the good faith of the infringer and the competence of the opinion relied upon. Factors which may shed light on the good faith of the infringer include when the client sought advice from counsel (before or after commencing infringing activities), the infringer's knowledge of the skill, independence, and competence of the attorney rendering the opinion of counsel, and the infringer's knowledge of the extent of the analysis performed by the attorney.

■ In evaluating the competence of the opinion itself, all that is relevant is whether the document or communication and other related communications are so deficient that no reasonable client could rely on it or them. This question must be answered from the perspective of the reasonable client. An opinion may be deficient because it contains only conclusory findings with no justification or analysis.

Additionally, the court intends to give the following special verdict to the jury on the factual question of whether CellPro willfully infringed the '204 patent.

844

*SPECIAL VERDICT*

We, the jury, unanimously find as follows:

## I. *WILLFUL INFRINGEMENT*

1. Do you find that plaintiffs have shown by clear and convincing evidence that Cell-Pro willfully infringed *the '204 patent*? (A "YES" answer to this question is a finding for Johns Hopkins University, Baxter Healthcare, and Becton Dickinson. A "NO" answer is a finding for CellPro.)

YES _____ NO _____

*CONCLUSION*

For these reasons and the reasons identified by the court in the conferences associated with this case, the court will instruct the jury in accordance with this Opinion.